# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF ATLANTA FIREFIGHTERS PENSION FUND, on Behalf of Itself and all Others Similarly Situated, | ) ) ) ) ) No. 1:16-cv-4151 |
| *Plaintiff*, | ) ) CLASS ACTION COMPLAINT ) |
| vs. | ) ) JURY TRIAL DEMANDED |
| BANK OF AMERICA, N.A., BANK OF AMERICA MERRILL LYNCH INTERNATIONAL LIMITED, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT SUISSE AG, DEUTSCHE BANK AG, NOMURA INTERNATIONAL PLC, HIREN GUDKA, AMANDEEP SINGH MANKU, SHAILEN PAU, and BHARDEEP SINGH HEER, | ) ) ) ) ) ) ) ) ) ) |
| *Defendants*. | ) ) ) |

Plaintiff City of Atlanta Firefighters Pension Fund, on behalf of itself and all others similarly situated, brings this class action for violations of the Sherman Act, Clayton Act, and state common law against Defendants, which are among the largest dealers, or who are among the most prominent traders, of supranational, sub-sovereign, and agency bonds denominated in various currencies ("SSA bonds"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      This antitrust class action concerns Defendants' collusive activities to fix the prices of SSA bonds sold to and purchased from investors in the secondary market. SSA bonds are issued by a variety of international entities, including, among others: provinces and states;

regional development banks; infrastructure borrowers such as highway and bridge authorities; social security funds; export creditors; and rail sector entities. International issuers sometimes issue their debt in currencies different from their local currency, including U.S. dollars, to take advantage of potentially lower all-in funding costs, as well as to broaden the potential pool of investors to which these bonds can be sold.

2.      The size of the SSA bond market has grown significantly over the past ten years. The estimated value of the SSA bond market is over $9 trillion.

3.      Major participants in the secondary market (*i.e.*, post-bond issuance) for SSA bonds include institutional investors, mutual funds, hedge funds, and pension funds. These entities invest in SSA bonds because SSA bonds are generally considered low-risk, secure investments (*i.e.*, investments with a low risk of default).

4.      The bank Defendants are among the world's largest dealers of SSA bonds in the secondary market and act as market-makers. They compete for customers in the secondary market based on the prices they offer for the purchase and sale of SSA bonds. Bond dealers typically quote bond prices to investors by providing them with their bid and ask prices. Generally, the smaller the "spread" (difference) between the "bid" (buy) and "ask" (sell) prices the better and more competitive the prices are for customers. Bid and ask prices are usually set in terms of basis points, *i.e.*, 1/100th of one percent.

5.      Defendants also compete to underwrite SSA bond offerings. In connection with soliciting underwriting services, SSA bond issuers often favor those institutions that have demonstrated the ability to provide liquidity in the secondary market by trading large volumes of that issuer's bonds.

6.      Rather than compete with each other by offering narrower bid-ask spreads, from at least as early as January 1, 2005, Defendants colluded with each other to fix the prices at which they bought and sold SSA bonds in the secondary market. That is, they agreed to widen the bid-ask spreads they quoted to customers, thereby increasing the prices investors paid for the SSA bonds or decreasing the prices at which investors sold the bonds. No one Defendant could afford to widen its bid-ask prices unilaterally without fearing the loss of trading business to its competitors. Such action also could jeopardize a Defendant's ability to secure new underwriting business from SSA bond issuers in the future.

7.      The bank Defendants' traders orchestrated and maintained their conspiracy via regular electronic communications, including instant messaging and chatrooms. Through such communications, these traders discussed their respective customers' identities and confidential information about the size and nature of their orders before deciding the prices that they would quote to their customers for SSA bonds. These traders included Defendants Hiren Gudka, who worked at Bank of America and Deutsche Bank; Amandeep Singh Manku, who worked at Bank of America and Credit Agricole; Shailen Pau, who worked at Credit Suisse; and Bhardeep Singh Heer, who worked at Nomura. According to one major publication, Defendants' traders "created a new chatroom each day to discuss activity and prices" in the SSA bond secondary market.[1]

8.      Defendants' conduct has drawn the scrutiny of U.S. and European regulators. The U.S. Department of Justice ("DOJ") has launched an extensive investigation into Defendants' practices in the SSA bond market and has obtained—and is currently reviewing—transcripts of electronic chatrooms used by Defendants' SSA bond traders. Similarly, the U.K. Financial

---

[1] Abhinav Ramarayan & Helene Durand, *EXCLUSIVE – DoJ investigates bond traders over market-rigging*, Int'l Fin. Rev. (Jan. 6, 2016) http://www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-rigging/21230385.article.

Conduct Authority ("FCA") and the European Commission ("EC") have opened preliminary investigations into potential anticompetitive conduct in the SSA bond market. The FCA is reportedly coordinating its investigatory efforts with DOJ. As a result of these investigations, the bank Defendants have either terminated or suspended at least four prominent SSA bond traders: Defendants Gudka, Manku, Pau, and Heer.

9.      Defendants' misconduct has caused, and continues to cause, injury to investors of SSA bonds in the secondary market. Defendants have inflated the prices at which they sold SSA bonds to investors and reduced the prices at which they purchased these products from investors, including Plaintiff and members of the Class. Thousands of U.S.-based investors have purchased and sold billions of dollars' worth of SSA bonds directly from Defendants. Plaintiff, on behalf of itself and all others similarly situated, seeks damages arising from Defendants' misconduct, trebled as provided by law, and injunctive relief, enjoining the continuation of the alleged misconduct.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. § 1391(b), (c), (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

12.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business throughout the United States, including in this District; had substantial

contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States.

13.     In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District, and Plaintiff's claims arise out of Defendants' conduct. Defendants' SSA bond traders dealt directly with U.S.-based investors, buying and selling SSA bonds from them in a continuous flow of interstate and foreign commerce. Accordingly, Defendants' anticompetitive conduct had direct, substantial, and reasonably foreseeable effects on U.S. commerce.

14.     The activities of Defendants were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

**THE PARTIES**

**A.     Plaintiff**

15.     Plaintiff City of Atlanta Firefighters Pension Fund ("Atlanta Firefighters") is a government defined-benefit plan located in Tucker, Georgia. Plaintiff directly transacted in SSA bonds denominated in various currencies with one or more of the Defendants in the secondary market. As a direct and proximate result of Defendants' collusive and manipulative activities, Plaintiff was injured in its business or property.

**B.     Defendants**

16.     Defendant Bank of America, N.A. is a banking and financial services firm with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina. Bank of American, N.A. is registered with the New York Department of Financial Services ("NYDFS").

17.     Defendant Bank of America Merrill Lynch International Limited is a subsidiary of Bank of America, N.A., with its principal place of business located at 2 King Edward Street, London EC1A 1 HQ, England.

18.     Defendants Bank of America, N.A. and Bank of America Merrill Lynch International Limited are collectively referred to as "**Bank of America**." During the Class Period, Bank of America purchased and sold SSA bonds to members of the Class. During the Class Period, Bank of America employed Amandeep Singh Manku and Hiren Gudka, both of whom are SSA bond traders under investigation by DOJ.

19.     Defendant Credit Agricole Corporate and Investment Bank ("**Credit Agricole**") is a banking entity headquartered at 9, quai du President Paul Doumer, La Defense Cedex, 92920 Paris, France. Credit Agricole is registered with NYDFS as a foreign branch and maintains offices in New York located at 1301 Avenue of the Americas, New York, New York. Credit Agricole also maintains offices in London, England at Broadwalk House, 5 Appold Street, London EC2A 2DA. During the Class Period, Credit Agricole purchased and sold SSA bonds to members of the Class. During the Class Period, Credit Agricole employed Defendants Amandeep Singh Manku and Shailen Pau.

20.     Defendant Credit Suisse AG ("**Credit Suisse**") is a banking entity with a New York foreign branch office located at 11 Madison Avenue, 24th Floor, New York, New York. Credit Suisse is registered with NYDFS. Credit Suisse also maintains offices in London, England at 1 Cabot Square, London E14 4QJ. During the Class Period, Credit Suisse purchased and sold SSA bonds to members of the Class. During the Class Period, Credit Suisse employed Defendant Shailen Pau, an SSA bond trader who is under investigation by DOJ.

21.     Defendant Deutsche Bank AG ("**Deutsche Bank**") is a banking entity with a New York foreign branch office located at 60 Wall Street, 4th Floor, New York, New York. Deutsche Bank is registered with NYDFS. Deutsche Bank also maintains offices in London, England at Winchester House, 1 Great Winchester Street, London, EC2N 2DB. During the Class Period,

Deutsche Bank purchased and sold SSA bonds to members of the Class. During the Class Period, Deutsche Bank employed Defendant Hiren Gudka.

22.     Defendant Nomura International Plc ("**Nomura**") is a financial services company with its principal place of business at 1 Angel Lane, London EC4R 3AB, England. Nomura operates as a subsidiary of Nomura Europe Holdings plc. During the Class Period, Nomura purchased and sold SSA bonds to members of the Class. During the Class Period, Nomura employed Defendant Bhardeep Singh Heer, an SSA bond trader under investigation by DOJ.

23.     Defendant Hiren Gudka ("**Gudka**") is an individual residing in Middlesex, England. During the Class Period, Gudka purchased and sold SSA bonds to members of the Class. During the Class Period, Gudka was an SSA bond trader employed by Defendants Bank of America and Deutsche Bank.

24.     Defendant Amandeep Singh Manku ("**Manku**") is an individual residing in Essex, England. During the Class Period, Manku purchased and sold SSA bonds to members of the Class. During the Class Period, Manku was an SSA bond trader employed by Bank of America and Credit Agricole.

25.     Defendant Shailen Pau ("**Pau**") is an individual residing in London, England. During the Class Period, Pau purchased and sold SSA bond to members of the Class. During the Class Period, Pau was an SSA bond trader employed by Credit Suisse and Credit Agricole.

26.     Defendant Bhardeep Singh Heer ("**Heer**") is an individual residing in Essex, England. During the Class Period, Heer purchased and sold SSA bonds to members of the Class. During the Class Period, Heer was an SSA bond trader employed by Nomura.

27.     Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

## FACTUAL BACKGROUND

### A.     SSA Bond Market

*Background*

28.     Government entities issue debt in the form of bonds, which are typically used to fund ongoing and future operations.

29.     Debt issued by national governments is called "sovereign debt." Examples of sovereign debt include U.S. Treasury bills, notes, and bonds; French OATs (Obligations Assimilables du Tresor); and German Bunds.

30.     Debt issued by political subdivisions within a country is called "sub-sovereign debt." Examples include debt issued by Canadian provinces or German states (Landers).

31.     "Agency debt" is debt issued by administrative bodies created by sovereign and sub-sovereign entities. Examples include bonds issued by the French social security administration, Caisse d'Amortissement de la Dette Sociale ("CADES"); Dutch local government funding agencies Bank Nederlandse Germeeten ("BNG") and Nederlandse Waterschapsbank ("NEDWB"); Japan Bank for International Cooperation ("JBIC"); or the German redevelopment bank, Kreditanstalt für Wiederaufbau ("KfW").

32.     "Supranational debt" is debt issued by supranational organizations—entities created as a result of collaboration between foreign governments to serve a particular purpose. Supranational debt includes debt issued by the European Investment Bank ("EIB") and the World Bank.

33.     Sub-sovereign and agency entities typically issue bonds in their local currency. However, these SSA bond issuers can and do issue debt in other currencies under certain circumstances, including the following:

(a)     SSA bond issuers may seek to take advantage of lower borrowing costs. For example, European SSA bond issuers may issue bonds in U.S. dollars because of lower costs associated with borrowing in U.S. dollars compared to borrowing in Euros.

(b)     Issuers may issue SSA bonds in U.S. dollars to diversify their investor base to include a broader number of U.S. investors.

(c)     Volatility in a local currency, which can lead to devaluation of the SSA bonds issued in that currency, may encourage an entity to issue debt in currencies with more stability (whether perceived or real). For example, if the Japanese government prints more Japanese yen (*i.e.*, increasing the money supply) in order to meet existing national debt obligations, the Japanese yen becomes less valuable relative to other currencies. This devaluation of the yen impacts investors of yen-denominated SSA bonds by potentially causing them to lose money in real terms (*i.e.*, relative to having invested in debt denominated to a different currency). Thus, to reduce this risk and attract a larger and broader base of investors, an entity may issue debt in other, less volatile currencies.

34.     As with other bonds, SSA bonds are issued through one or more banks, which are charged with creating a market for the issue. This entails, among other things, judging investor demand for these products and the price at which they can be sold, and ultimately, distributing (selling) the bonds to the public. This process is known as "underwriting." The sale of bonds in the initial offering is known as the "primary market." Primary market participants include major financial institutions, pension funds, mutual funds, hedge funds, insurance companies,

foundations, state and local governments, foreign central banks, institutional investors, and at times, the underwriters themselves.

35.     Typically, the largest SSA bond issuers tend to issue bonds worth at least $1 billion in a single offering. For example, in January 2015, CADES issued $5 billion in SSA bonds to customers—$2.5 billion of which was underwritten by Defendants Deutsche Bank and Bank of America.[2]

36.     Appointment as a lead or managing underwriter is usually a competitive process among banks, with each bank submitting bids to SSA bond issuers for underwriting services. Bonds are usually underwritten by a group of banks called a "syndicate," with certain banks taking more responsibility in underwriting the bond issue than others.

37.     Banks, including Defendants, compete with each other to provide these services. An important criterion in an issuer's selection of an underwriter is the bank's ability to provide liquidity in the secondary market. For example, an EIB official stated that "[l]ike all responsible issuers, we too monitor our secondary market liquidity and turnover. In other words, we also monitor trading performance of dealers."[3] A former trader at one of the bank Defendants acknowledged this: "Issuers conduct empirical measurements and publish a chart. They use these charts to award business . . . . So say, you are bank Z, you will get told by the issuer where you rank on that chart to incentivize you to do more secondary business."[4] Thus, issuers often favor those banks with a proven track-record of providing liquidity in the secondary market.

_____

[2] CADES, Final Terms, Issue of USD 5,000,000,000 1.25 per cent, http://www.cades.fr/pdf/emprunts/uk/2014/FT_28janv2014.pdf.

[3] Abhinav Ramarayan & Helene Durand, *EXCLUSIVE – DoJ investigates bond traders over market-rigging*, Int'l Fin. Rev. (Jan. 6, 2016) http://www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-rigging/21230385.article.

[4] *Id.*

38.     Banks selected to perform underwriting services earn a fee for these services, as well as profits from the sale of the SSA bond issuer's bonds.

***SSA bonds have become increasingly popular investments***

39.     Recent global economic crises and the consequent flight from investment risk have resulted in the SSA bond market becoming an increasingly important sector within the overall bond market because of SSA bonds' relatively low risk profiles. SSA bonds are generally regarded as highly secure investments. And SSA bond issuers are generally characterized by having "well-diversified, high performing portfolio assets with . . . strong capital ratios and healthy liquidity buffers."[5]

40.     Moreover, SSA bond issuers typically enjoy special legal status that, in effect, links the credit worthiness of the SSA bond issuer to that of its sovereign, in the case of a sub-sovereign or agency issuer, or in the case of a supranational issuer, to a group of sovereigns or institutional shareholders.[6] For example, certain German entities, such as KfW, benefit from statutory guarantees (Gewährträgerhaftung) that give creditors the right to lodge a claim directly against the German federal government.[7] Similarly, certain French lending institutions are considered Établissements Publics ("EPs"), which are fully owned and controlled by the French government. This means EPs cannot enter bankruptcy and their debts, while not legally guaranteed by the French government, are "deemed so strong that the[ir] ratings . . . are equalized with the ratings of the Republic of France."[8]

---

[5] Richard McGuire, et al., SSA Market Primer, Rabobank (Sept. 12, 2014).

[6] *Id.*

[7] Jacob Ejsing, et al., *Liquidity and Credit Risk Premia in Government Bond Yields* at 7, European Central Bank Work Paper Series No. 1440 (June 2012), https://www.ecb.europa.eu/pub/pdf/scpwps/ecbwp1440.pdf?1232475cd6cb5e3a32228b6c232a50be.

[8] *Id*; UniCredit, *European agency issuers*, at 47 (July 11, 2012), https://www.research.unicreditgroup.eu/DocsKey/credit_docs_2012_127792.ashx?EXT=pdf&KEY=n03ZZLYZf5l2PWPsZLYmHxhN_xtR5xjJRGd7ZgDqzHs=.

41.     As a result of both explicit and implicit guarantees on their debt, SSA bond issuers enjoy very high credit ratings, and their bonds are considered "investment grade" (*i.e.*, low risk of default).

42.     The table below shows some of the largest SSA bond issuers and provides their credit ratings as determined by Standard & Poor's ("S&P") and Moody's, two leading credit rating agencies. A bond is considered investment grade if its credit rating is "BBB-" or higher by S&P, or "Baa3" or higher by Moody's. As can be seen in the table below, SSA bonds are often highly rated:

| Credit Ratings for Top Foreign SSA issues in Barclays U.S. Aggregate Index* | |
|---|---|
| **Issuer** | **S&P / Moody's Rating** |
| KfW | AAA/Aaa |
| EIB | AAA/Aaa |
| Ontario, Canada | AA-/Aa2 |
| CADES | AA+/Aaa |
| BNG | AAA/Aaa |
| JBIC | AA-/Aa3 |
| Rentenbank (German agricultural bank) | AAA/Aaa |
| Quebec, Canada | A+/Aa2 |

*As of Sep. 30, 2012

43.     Investor demand for SSA bonds has increased steadily between 2005 and the present. Indeed, over the period 2005-2012, the SSA bond market tripled in size. The economic meltdown that precipitated from the 2007-2008 U.S. mortgage crisis reduced the attractiveness of the bond offerings of certain U.S. government-sponsored entities ("GSEs")—particularly, Fannie Mae and Freddie Mac. This increased the appeal of bonds issued by foreign SSA bond

issuers. Indeed, as the chart below shows, while the value of outstanding U.S. GSE bonds shrank

after the second quarter of 2009, there was a corresponding uptick in the volume of SSA bonds

issued:



Figure 1: Amount outstanding in government-related sector subcomponents of the Barclays U.S. Aggregate Index

Source: Bloomberg, Barclays as of 31 July 2012.
Note: Not included in these totals is the related covered bond market, which is instead classified as the securitized component of the Barclays Aggregate Indexes. Note that 98% of SSA issuance is denominated in the six major currencies of U.S. dollar (39%), the Euro (28%), British pound (4%), Japanese Yen (19%), Canadian dollar (5%) and Australian dollar (3%).

44.    SSA bonds have remained a popular investment, and more recently, there has

been an increased demand specifically for U.S. dollar-denominated SSA bonds.

45.    This demand likely derived from several conditions. First, the European sovereign

debt crisis jeopardized the solvency of certain countries and triggered fears of contagion

throughout the Eurozone. Second, even relatively healthy Eurozone countries, such as Germany,

sustained low interest rates from the European Central Bank, which were coupled with the

lingering threat of deflation (a period of sustained price decline in response to slack demand in

the market). Deflation worsens the position of debtors like SSA bond issuers because it raises the inflation-adjusted value of their debts. Thus, while their debt amount remains the same, because the cost of everything is less, SSA bond issuer revenues are reduced, making their debts harder to pay off in real terms.

46.     As a result, many European entities found that issuing SSA bonds in U.S. dollars provided greater economic opportunities—both in terms of funding costs and generating investor appetite. Indeed CADES, a French SSA bond issuer, noted that conditions created a "favorable cross-currency basis swap [between U.S. dollars and euros that] has allowed us to swap the proceeds back into euros to achieve very attractive all-in funding costs."[9]

### B.     Pricing of SSA Bonds

47.     As with other bonds, the prices of SSA bonds are stated in terms of the bond's par value, coupon, and maturity date. A bond's par value is its face value, payable on the bond's maturity date. A bond's coupon is the interest rate that the bond issuer must pay an investor. Coupons are paid to the bond-holder periodically—usually every 6 months, although that can vary—until the bond reaches maturity.

48.     Bond prices are generally quoted as a discount or premium to the bond's par value. For example, a bond with a par value of $1,000 may sell at a discount of 2%, or $980. A dealer selling this bond would provide its customer a quote of "98." A bond may sell at a discount because its coupon is lower than prevailing interest rates in the marketplace, which means that in order to sell it, the holder must lower the price of the bond to make it competitive with other bonds in the market.

---

[9] Philip Moore, *In a Turbulent SSA Bond Mark, Buyers Seek Better Spreads*, Institutional Investor, at 3 (June 2015), http://www.institutionalinvestor.com/images/416/Special%20Reports/FrequentBorrowers.pdf.

49.     A bond's attractiveness can also be stated in terms of its yield. Yield is a figure that shows the return that an investor receives by holding the bond to maturity. Bond price and yield have an inverse relationship: lowering one will result in a rise in the other, as demonstrated by the chart below:



50.     This inverse relationship is due to the fact that a bond's price will be higher when it pays a coupon that is higher than prevailing interest rates. As market interest rates increase, bond prices decrease. Because yield takes into account both a bond's coupon and its price, yield can be an effective means to compare bonds with different coupons and prices.

51.     As a result of their relative safety, SSA bonds usually trade at a price that is comparable to sovereign debt. In industry parlance, the price spread between SSA bonds and sovereign debt is known as a "safe spread"—*i.e.*, the incremental yield over the sovereign debt counterpart but with the potential for minimal additional credit risk.

52.     The risk premium associated with SSA bonds over their sovereign bond counterparts can depend on a number of factors, including the level of credit risk associated with the guarantor; the level of political risk faced by the issuer; and the level of inherent liquidity risk, which itself is determined with respect to the tenor, size, and currency mix of the SSA bonds.

C.     **Trading in the Secondary SSA Bond Market**

53.     After the initial issuance of SSA bonds in the primary market, these bonds are further traded among bond dealers and investors, including pension, hedge, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments. The resale of SSA bonds after the initial offering is known as the "secondary market." For the largest SSA bond issuers, there is an active secondary market, with billions of dollars' worth of SSA bonds changing hands during the lifetime of the bonds.

54.     Customers seeking to purchase or sell SSA bonds will contact one or more banks, such as Defendants (or a broker who then contacts one of the Defendants), and request pricing for a particular SSA bond. The bank will quote the price for an SSA bond in terms of a "bid" price or an "ask" price. The bid price represents the maximum price at which a dealer will purchase the SSA bond; the ask price represents the minimum price at which a dealer will sell the SSA bond. The difference between these two values is the "bid-ask spread" (or "spread"), which reflects the dealer's profit for acting as a market maker and assuming the risk that it may be unable to purchase or sell the SSA bond in the future at better prices than it is offering at the time to its customer.

55.     As is typical in many financial markets, trading of SSA bonds is done through telephonic and, increasingly, electronic means. Orders are taken by salespersons at dealers, which are then relayed to bond traders at the banks' trading desks so they can be filled.

56.     Defendants dominate the secondary market, acting as "market-makers" that provide liquidity to investors by their willingness to buy and sell SSA bonds whenever an investor seeks to do so.

57.     Rational customers want to buy low and sell high. Banks and their bond traders, including Defendants, compete for customers based on the bid and ask prices they offer, and, in

turn, the spread between them. The narrower the bid-ask spread, the more competitive the prices.

A bank can gain customers and business by offering a narrower bid-ask spread than its

competitors. Conversely, if a bank widens the bid-ask spread—by either lowering the bid price

or raising the ask price—it would likely lose customers to rivals offering tighter spreads. Only

through collusion could a dealer quote a wider spread than market conditions otherwise dictate

without losing market share and profits.

### DEFENDANTS' WRONGFUL CONDUCT

58.     The bank Defendants are among the world's largest traders of SSA bonds in the

secondary market and act as market-makers for these instruments.

59.     In a competitive market, Defendants compete with each other for customers

seeking to buy and sell SSA bonds as well as to provide underwriting services for SSA bond

issuers. As explained above, issuers often select underwriters based on their ability to provide

liquidity in the secondary market.

60.     However, rather than compete with each other, Defendants and their traders

entered into an illegal scheme to fix the bid-ask spreads for SSA bonds sold to investors. This

scheme had the same effect as fixing the prices at which investors bought and sold SSA bonds in

the secondary market. Defendants' conduct ensured that investors received non-competitive

prices for their secondary market SSA bond trades.

61.      Defendants' scheme was driven by greed and opportunity. As one SSA bond

trader acknowledged: "*if you can speak to another trader and agree to sell a bond at a certain

price and not below, then that makes a big difference*."[10] Others noted that the collaborative

---

[10] Abhrinav Ramnarayan &Helene Durand, *EXCLUSIVE- DoJ investigates bond traders over market-rigging*,
Int'l Financing Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-
rigging/21230385.fullarticle (emphasis added).

nature of underwriting in the primary market may have encouraged collusion in the secondary market: "[O]nce banks are mandated [to perform underwriting services] they have to work together . . . . **_Given the collegia[l] nature, people might talk about things that they shouldn't_**."[11]

62.     Absent an agreement to fix bid and ask prices, no one Defendant could afford to widen its bid-ask spread unilaterally. To do so would result in a Defendant losing substantial trading business to competitors offering more competitive pricing. That loss could jeopardize a Defendant's ability to secure new underwriting business from SSA bond issuers in the future. One syndicate head stated that there was considerable pressure on SSA bond traders to perform, and that this may have "creat[ed] the motivation and opportunity for market rigging."[12]

63.     According to those familiar with Defendants' misconduct, Defendants' SSA bond traders communicated with each other about their respective customers' SSA bond purchase and sell orders via electronic means including, but not limited to, instant messaging and electronic chatrooms.

64.     In these communications, Defendants' traders exchanged confidential information about their customers' identities, trading habits, and order sizes. The exchange of this sensitive customer information enabled Defendants' traders to coordinate the bid and ask prices they offered to their respective customers.

65.     Bond traders in the SSA bond market communicated with each other frequently. According to news reports, "the use of permanent Bloomberg chatrooms within market sectors

---

[11] Craig McGlashan, *et al.*, *'Forced competition' to generate trading flow under fire for fomenting SSA scandal*, Global Capital (Jan. 7, 2016), http://www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39-to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal.

[12] *Id.*

was commonplace in the City [of London]."[13] One SSA bond trader interviewed stated that bond traders "***created a new chatroom each day to discuss activity and prices***."[14] The repetitive nature of Defendants' chatroom discussions not only enabled them effectively to coordinate bid and ask prices and spreads, but also to provide an effective means of policing their conspiracy. A Defendant who failed to adhere to agreed-upon pricing could quickly be identified and barred from any further participation in the chatrooms. Accordingly, Defendants' SSA bond traders had little incentive to cheat.

66.     Members of these chatrooms included at least the following Defendant SSA bond traders: Gudka of Bank of America (and formerly of Deutsche Bank); Manku of Credit Agricole (and formerly of Bank of America); Pau of Credit Suisse; and Heer of Nomura. Each trader Defendant lived in London or its suburbs, and some worked in the same bank Defendants' London offices. For example, Manku and Gudka both worked at Bank of America's London offices at its bond desk during the Class Period. Similarly, Manku and Pau both worked at Credit Agricole during the Class Period. Prior to their departures, these individuals were major SSA bond traders, with one head bond trader stating that "[t]hey were experienced people, especially Hiren Gudka who was a big name in this market."[15]

67.     By communicating with each other about aligning the prices and spreads they would quote to investors, Defendants also discouraged investors from aggressively comparing prices. Shopping around for better pricing was ultimately a pointless endeavor because the

---

[13] Abhrinav Ramnarayan &Helene Durand, *EXCLUSIVE- DoJ investigates bond traders over market-rigging*, Int'l Financing Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-rigging/21230385.fullarticle.

[14] *Id.* (emphasis added).

[15] Craig McGlashan, *et al.*, *'Forced competition' to generate trading flow under fire for fomenting SSA scandal*, Global Capital (Jan. 7, 2016), http://www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39-to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal.

quotes received from one Defendant would be identical to those offered by the other Defendants. From the customer's perspective, the matching quotes would suggest that the prices offered by any one Defendant was a competitive market price. Unbeknownst to the customer, however, these prices were actually the product of back-channel collusion between Defendants' traders.

68.   Further, given Defendants' individual and collective market power in the secondary market for SSA bonds, their fixing of the SSA bond bid and ask prices, left their customers that sought to purchase or sell these instruments little choice but to accept the artificially widened bid-ask spreads on their SSA bonds transactions.

69.   The tools used by Defendants to orchestrate their conspiracy are strikingly similar to those used by major foreign exchange ("FX") dealer banks that have been accused of—and in some cases pleaded guilty to—manipulating the FX market. In the FX market, regulators and government enforcers found that FX traders at major dealer banks used electronic means, including instant messaging and chatrooms, to discuss and implement collective trading strategies to move key FX benchmarks and trigger customer stop-loss and limit orders. These FX traders were further found to have used these platforms to discuss and fix the spreads of certain FX transactions quoted to customers.

70.   As a result of Defendants' price-fixing scheme, investors, including Plaintiff and the Class, paid supracompetitive prices for SSA bonds in the secondary market and, as a result, suffered injury to their business or property.

## GOVERNMENT INVESTIGATIONS INTO SSA BOND MARKET

71.   In December 2015, *Bloomberg* reported that DOJ is "examining possible manipulation in the trading of agency bonds."[16] Significantly, sources close to the investigation

---

[16] David McLaughlin & Tom Schoenberg, *U.S. Said to Probe Possible Rigging in Agency Bond Market*, Bloomberg (Dec. 9, 2015), http://bloom.bg/1RaD1OR.

have told *Bloomberg* reporters that DOJ's investigation is criminal in nature. DOJ officials investigating the matter "are focusing on activity by London-based traders" and are examining "whether the traders at different banks coordinated with each other before deciding who would offer price quotes to potential buyers and sellers."[17] Later reports stated that DOJ "is investigating allegations that SSA bond traders at different banks agreed [on] prices and shared information on certain US dollar bonds in chatrooms they established for that purpose."[18]

72.    Pursuant to its investigation, DOJ "obtained transcripts of online chat-room conversations indicating possible misconduct and asked banks to delve further into the behavior."[19] Specific trader Defendants under investigation include: Gudka of Bank of America (and before that, Deutsche Bank); Manku of Credit Agricole (and before that, Bank of America); Heer of Nomura; and Pau of Credit Suisse (and before that, Credit Agricole).

73.    In addition to DOJ's investigation, the FCA and EC have also begun their own preliminary inquiries into the manipulation of the SSA bond market. The FCA is reportedly working closely with DOJ to coordinate their respective investigations. The EC's investigation reportedly started at the same time as DOJ's investigation.

74.    Certain Defendants have acknowledged the regulatory inquiries into their SSA bond market operations. For example, in its 2015 annual report, Credit Agricole disclosed that "several regulators have demanded information" from Credit Agricole regarding the "activities of different banks" in the SSA bond market. Credit Agricole confirmed that it was in the process of collecting and producing documents pursuant to regulatory demands and that this process

---

[17] *Id.*

[18] Abhinav Ramnarayan & Helene Durand, *EXCLUSIVE – DoJ investigating bond traders over market-rigging,* Int'l Fin. Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-rigging/21230385.article.

[19] Suzi Ring & Tom Schoenberg, *U.K. Said to Open Probe Into Rigging of Agency-Bond Market*, Bloomberg (Jan. 20, 2016), http://bloom.bg/1NjWIfO.

would continue through 2016.[20] The other bank Defendants are reportedly cooperating with regulators and have provided chat and email records to them.

75.      Further, regulatory scrutiny of price-fixing conduct has resulted in Defendants terminating or suspending several SSA bond traders, including those named as defendants in this Complaint. Credit Suisse terminated Pau in October 2015. Nomura has suspended Heer. And Gudka of Bank of America and Manku of Credit Agricole both abruptly left their positions in November 2015 and December 2015, respectively.

## SIMILAR WRONGDOING IN OTHER MARKETS SUPPORTS THE PLAUSIBILITY OF DEFENDANTS' MANIPULATION OF SSA BONDS

76.      Defendants' conduct in this case is part of a larger set of revelations emerging about similar manipulation, collusion, and other anticompetitive conduct uncovered in various financial markets.

77.      Indeed, many of these same Defendants, along with numerous other dealer banks, have been implicated in or found liable for price-fixing schemes involving other financial products and benchmarks, including: FX, various Interbank Offered Rates (*e.g.*, LIBOR), and Swiss franc derivatives. Further, the methods employed to fix prices in these markets— communications between competing traders through telephone, electronic chatrooms, and instant messaging—are strikingly similar to those employed by Defendants' SSA bond traders as alleged here.

### A.      FX Market Manipulation

78.      Numerous banks, including Defendant Bank of America, were recently fined over $10 billion by various enforcers throughout the world stemming from the banks' conspiracy to manipulate FX benchmarks as well as to fix the bid-ask spreads on FX transactions. The conduct

---

[20] Credit Agricole Group Financial Statements 2015, at 213.

some of these banks have admitted to perpetrating included agreeing to fix the spreads on customer FX transactions; agreeing to enter into trading strategies to manipulate benchmark prices; disclosing confidential customer order information and trading positions; adjusting trading positions to accommodate the interests of the collective group; and trading to trigger customers' limit orders or customers' barrier options for the bank's benefit and to the detriment of those customers.

79.     The Office of the Comptroller of the Currency ("OCC") and the Federal Reserve Board ("Fed") found that Bank of America's FX traders in the FX spot market routinely communicated with FX traders at other financial institutions through chatrooms. These traders shared confidential customer and proprietary bank information with other FX traders, including customer order flows and bid-ask spreads, and coordinated trading strategies to manipulate spot FX reference rates for their benefit and to the detriment of their customers. The traders also triggered customer stop-loss and limit orders for their own benefit and to the detriment of their customers. In addition, Bank of America's FX traders were found to have engaged in questionable trading strategies, including front-running client orders, that raised "potential conflicts of interest." Bank of America was found to have failed to employ internal policies and procedures that would have enabled them to detect these significant issues. For these activities, Bank of America was fined and paid $600 million.

80.     Defendants Bank of America, Credit Suisse, and Deutsche Bank are also named as defendants in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.), where plaintiffs allege that defendants fixed the bid-ask spreads on FX transactions quoted to customers. Defendant banks' FX traders participated in several electronic chatrooms to discuss and coordinate their FX trading strategies and price-fixing conspiracy. In addition, Bank

of America, Credit Suisse, and Deutsche Bank are alleged to have suspended certain senior FX traders as a result of their participation in these chatrooms. Bank of America settled the class allegations against it for $180 million.

### B.   LIBOR Manipulation

81.     Several banks, including Defendants Deutsche Bank, have also been implicated in (and either admitted liability for or pleaded guilty to) coordinating and submitting deliberately false quotes in connection with the setting of various Interbank Offered Rates, including the London Interbank Offered Rate ("LIBOR") and the European Interbank Offered Rate ("EURIBOR"). Total fines in connection with criminal and civil investigations have exceeded $9 billion.

82.     On December 4, 2013, the EC Defendant Deutsche Bank, together with five other banks, **over €1.7 billion ($2.31 billion**, at the time of the fine) in connection with rigging of various Interbank Offered Rates, including Yen LIBOR and EURIBOR. In connection with its participation in two cartels to manipulate the values of Yen LIBOR and EURIBOR, Defendant Deutsche Bank was fined €725.4 million ($982.92 million).

83.     Joaquín Almunia, then-Commission Vice-President in charge of competition policy, said:

> What is shocking about the LIBOR and EURIBOR scandals is not only the manipulation of benchmarks, which is being tackled by financial regulators worldwide, but also the collusion between banks who are supposed to be competing with each other. . . . Healthy competition and transparency are crucial for financial markets to work properly, at the service of the real economy rather than the interests of a few.[21]

---

[21] Press release, Amended – Antitrust: Commission fines banks €1.49 billion for participating in cartels in the interest rate derivatives industry (Dec. 4, 2013), http://europa.eu/rapid/press-release_IP-13-1208_en.htm.

84.     More recently, Defendant Deutsche Bank entered into a deferred prosecution agreement with DOJ, in which it accepted criminal responsibility for engaging in of wire fraud and price-fixing in violation of the Sherman Act, 15 U.S.C. § 1. DOJ found that Deutsche Bank employees, along with their co-conspirator counterparts at other banks, "engaged in efforts to move [the LIBOR and EURIBOR] benchmark rates in a direction favorable to their trading positions."[22] As part of its non-prosecution agreement, Deutsche Bank agreed to pay **$625 million** in fines[23] and admitted that it colluded with other banks to manipulate LIBOR submissions and that its "employees engaged in this misconduct through face-to-face requests, electronic communications, which included both emails and electronic chats, and telephone calls."[24]

85.     In connection with DOJ's investigation of Deutsche Bank, a Deutsche Bank subsidiary also pleaded guilty to one count of wire fraud in connection with Deutsche Bank's manipulation of LIBOR and EURIBOR. This subsidiary was assessed a **$150 million** criminal penalty.[25] Additional penalties against Deutsche Bank were assessed by the U.S. Commodity Futures Trading Commission ("CFTC") ($800 million); New York Department of Financial Services ($600 million); and the FCA ($344 million). Others dealer banks have similarly pleaded guilty criminal charges and/or paid massive civil penalties to U.S. and foreign authorities to in connection with charges relating to LIBOR and/or EURIBOR manipulation.

---

[22] Press Release, Deutsche Bank's London Subsidiary Agrees to Plead Guilty in Connection with Long-Running Manipulation of LIBOR (Apr. 23, 2015), http://www.justice.gov/opa/pr/deutsche-banks-london-subsidiary-agrees-plead-guilty-connection-long-running-manipulation.

[23] *Id.*

[24] *Id.*

[25] Plea Agreement at ¶ 17, *United States v. DB Group Srvs. UK Limited*, *available at* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/04/23/dbgs_plea_agreement.pdf.

### C.     Swiss Franc Derivatives Bid-Ask Spread Fixing Cartel

86.     On October 21, 2014, the EC imposed fines of nearly €32.4 million ($41.2 million at the time of the fines) against Defendant Credit Suisse and three other banks. The EC found that between May 2007 and September 2007, Credit Suisse, together with other banks, "agreed to quote to all third parties wider, fixed bid-ask spreads on certain categories of short term over-the-counter Swiss franc interest rate derivatives, whilst maintaining narrower spreads for trades among themselves."[26]

87.     The purported aim of the cartel was to "lower the parties' own transaction costs and maintain liquidity between them whilst seeking to impose wider spreads on third parties. Another objective of the collusion was to prevent other market players from competing on the same terms as these four major players in the Swiss franc derivatives market."[27]

### D.     Euro Interest Rate Derivatives Cartel

88.     On May 20, 2014, the EC issued a Statement of Objections against Defendant Credit Agricole and two other banks. The EC issued the Statement of Objections because of a suspected "breach[] [of] EU antitrust rules by colluding to influence the pricing of interest rate derivatives denominated in the euro currency."[28] The EC's investigation is ongoing.

### E.     Credit Default Swaps Manipulation

89.     Defendants Bank of America, Credit Suisse, and Deutsche Bank, among other banks, were also named as defendants in *In re Credit Default Swaps Antitrust Litigation*, No. 13-

---

[26] Press Release, Antitrust: Commission settles cartel on bid-ask spreads charged on Swiss Franc interest rate derivatives; fines four major banks €32.3 million (Oct. 21, 2014), http://europa.eu/rapid/press-release_IP-14-1190_en.htm.

[27] *Id.*

[28] Press release, Antitrust: Commission sends Statement of Objections to Credit Agricole, HSBC, and JPMorgan for suspected participation in euro interest rate derivatives cartel (May 20, 2014), http://europa.eu/rapid/press-release_IP-14-572_en.htm

md-2476 (S.D.N.Y.), where plaintiffs alleged that defendants colluded to prevent the development of exchange-traded platforms for CDS in order to maintain supracompetitive bid-ask spreads on CDS purchased from and sold to investors.

90.     Recently, Bank of America, Credit Suisse, and Deutsche Bank resolved these allegations, settling with plaintiffs and a class of investors for $90 million, $159 million, and $120 million, respectively.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who purchased or sold SSA bonds in the secondary market directly from Defendants in the United States from at least as early as January 1, 2005 through the present (the "Class Period").

> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

92.     Plaintiff believes that there are thousands of Class Members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

93.     There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, stabilize and/or otherwise manipulate the prices for SSA bonds in the secondary market in violation of the Sherman Act;

(b)     The identity of the participants in the conspiracy;

(c)     The duration of the conspiracy;

(d)     The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)     Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(f)     Whether Defendants fraudulently concealed the conspiracy's existence from Plaintiff and the Class;

(g)     The appropriate injunctive and equitable relief for the Class; and

(h)     The appropriate measure of damages sustained by Plaintiff and the Class.

94.     Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and Class Members sustained damages arising out of Defendants' common course of conduct in violation of the law as described in this Complaint. The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct.

95.     Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of absent Class Members. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

96.     The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications.

97.     The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

98.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail. The Class is readily definable and is one for which records should exist in the files of Defendants, Class Members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## DEFENDANTS FRAUDULENTLY CONCEALED THEIR MISCONDUCT

99.     Defendants concealed their wrongdoing in manipulating the prices of SSA bonds sold to investors. Thus, the statutes of limitations relating to the claims for relief alleged below were tolled due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

100.    Defendants' success in concealing their collusion was facilitated by their tremendous control over the market for SSA bonds.

101.    Neither Plaintiff nor Class Members knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports disclosing DOJ's investigation of the SSA bond market. Plaintiff and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date. Indeed, Defendants' collusive activities were so well hidden that regulators in the United States and elsewhere unaware of such conduct for years.

102.     Only after recent public reports disclosed DOJ's investigation of the SSA bond market did Plaintiff have a sufficient basis to investigate Defendants' possible collusion in the SSA bond market.

103.     Reasonable due diligence could not have uncovered the conspiracy because (i) Defendants' trading positions and trading strategies in the SSA bond market are not publicly available; (ii) the bilateral, non-exchange traded nature of SSA bond transactions make observing anticompetitive behavior in that market exceedingly difficult; (iii) the highly specialized and esoteric nature of the different aspects of the SSA bond market makes it exceedingly difficult for an ordinary person to assess improprieties; and (iv) neither Defendants nor their co-conspirators told Plaintiff or other Class Members that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the prices of SSA bonds.

104.     Defendants also took active steps to conceal evidence of their misconduct from Plaintiff, the Class, government regulators, and the public by, among other things: (i) holding out their activities in the SSA bond market as good faith market-making conduct; (ii) maintaining the secrecy of their price-fixing scheme; (iii) avoiding any discussion in public fora regarding their collusive activities and manipulation of SSA bond prices; and (iv) using non-public proprietary electronic communication platforms (*e.g.*, instant messaging, electronic chatrooms, etc.) to coordinate trading strategies.

105.     In addition, Defendants also failed to have the proper internal controls in place to detect misconduct concerning price-fixing of SSA bonds. Such internal failures made it all the more difficult for Plaintiff, the Class, government regulators, and the public to become aware of Defendants' and their co-conspirators' misconduct.

106.    As a result of Defendants' affirmative steps to conceal their improper conduct; their willful decision not to put in place proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and the resulting lack of public information about material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations was tolled for Plaintiff's claims.

### FIRST CLAIM FOR RELIEF

### VIOLATION OF 15 U.S.C. § 1
### CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

107.    Plaintiff incorporates the preceding paragraph by reference.

108.    Defendants entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

109.    During the Class Period, Defendants entered into an agreement to reduce competition among themselves by fixing and manipulating SSA bond prices sold in the United States and elsewhere.

110.    This conspiracy to manipulate SSA bond prices caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive SSA bond prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

111.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the SSA bond market. There is no legitimate business justification for, or pro-competitive benefits from,

Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of Defendants' conduct.

112.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

113.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein. Plaintiff and the Class are also entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

### UNJUST ENRICHMENT

114.    Plaintiff incorporates the preceding paragraph by reference.

115.    Because of the acts of Defendants as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

116.    It would violate established principles of equity and good conscience for Defendants to keep their ill-gotten profits from their price-fixing of SSA bonds in the secondary market.

117.    Plaintiff and Class Members transacted in SSA bonds directly with Defendants. By virtue of Defendants' price-fixing, Plaintiff and Class Members were deprived the benefits of a fair market, free from collusion. Defendants reaped millions of dollar in profits at the expense of Plaintiff and members of the Class as result of their misconduct.

118.    Accordingly, Plaintiff and the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein, by way of transactions for the sale or purchase of SSA bonds entered into with Defendants.

## RELIEF REQUESTED

Plaintiff demands relief as follows:

(A)     That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff is designated as a class representative, and that Plaintiff's counsel is appointed as counsel for the Class;

(B)     That the unlawful conduct alleged in the Complaint be adjudged and decreed to violate Section 1 of the Sherman Act;

(C)     That Defendants are permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint and that the Court direct such other equitable relief as may be appropriate;

(D)     That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

(E)     That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(F)     That the Court directs such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: June 3, 2016                              Respectfully submitted,


**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**                                  **HAUSFELD LLP**

  _/s/ Blair A. Nicholas__                         _/s/ Scott Martin__
Blair A. Nicholas                                Scott Martin
Benjamin Galdston                                33 Whitehall Street
David Kaplan                                     14th Floor
Lucas Gilmore                                    New York, NY 10004
Brandon Marsh                                    Tel: (646) 357-1100
12481 High Bluff Drive                           Fax: (212) 202-4322
Suite 300                                        smartin@hausfeld.com
San Diego, CA 92130
Tel: (858) 720-3183                              Michael D. Hausfeld
Fax: (858) 793-0323                              William P. Butterfield
blairn@blbglaw.com                               Timothy S. Kearns
benjaming@blbglaw.com                            Sarah R. LaFreniere
davidk@blbglaw.com                               **HAUSFELD LLP**
lucasg@blbglaw.com                               1700 K Street NW
brandonm@blbglaw.com                             Suite 650
                                                 Washington, DC 20006
                                                 Tel: (202) 540-7200
                                                 Fax: (202) 540-7201
                                                 mhausfeld@hausfeld.com
                                                 wbutterfield@hausfeld.com
                                                 tkearns@hausfeld.com
                                                 slafreniere@hausfeld.com


                                                 Michael P. Lehmann
                                                 Bonny E. Sweeney
                                                 Christopher L. Lebsock
                                                 **HAUSFELD LLP**
                                                 600 Montgomery Street
                                                 Suite 3200
                                                 San Francisco, CA 94111
                                                 Tel: (415) 633-1908
                                                 Fax: (415) 358-4980
                                                 mlehmann@hausfeld.com
                                                 bsweeney@hausfeld.com
                                                 clebsock@hausfeld.com


*Attorneys for Plaintiff*